AO 91 (Rev. 11/11) Criminal Complaint

FILED
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

# UNITED STATES DISTRICT COURT

for the

Northern District of California

United States of America
v.
Belinda Roy,

Defendant(s)

Case No. 3 19 71443

~~UNDER SEAL~~

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 21, 2017 in the county of San Francisco in the Northern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

WILLIAM FRENTZEN
Assistant United States Attorney

Complainant's signature

Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/3/19

Judge's signature

City and state: San Francisco, California

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*



# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for BELINDA ROY ("ROY"), and STELLA TEODORO ("TEODORO").

2. There is probable cause to believe ROY and TEODORO engaged in a scheme to defraud Medicare by receiving cash kickback payments in exchange for the referral of home health and/or hospice patients in violation of 42 U.S.C. §1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4. An identified co-conspirator introduced ROY and TEODORO to UCE and CW-1 as individuals willing to accept kickback payments in exchange for the referral of patients.

5. During the course of the investigation, UCE held in-person audio and video recorded conversations with ROY and TEODORO, in 2017 and 2018, in which ROY and TEODORO, received

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

kickback payments in the form of cash in exchange for the referral of home health and/or hospice patients.

**B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

8.      Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.      In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

**C. AGENT QUALIFICATIONS**

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

**D. COMPLAINANTS**

11. ROY is a 59 year old registered nurse and case manager at Washington Hospital Healthcare System (Washington Hospital) located at 2000 Mowry Avenue, Fremont, CA. During the

course of the investigation, ROY accepted approximately $8,500 in cash from UCE in exchange for patient referrals sent from Washington Hospital.

12. TEODORO was a 37 year-old registered nurse and case manager at Washington Hospital located at 2000 Mowry Avenue, Fremont, CA. TEODORO was later employed in a similar capacity at Kaiser Medical Center located at 3600 Broadway, Oakland, CA. During the course of the investigation, TEODORO was introduced to UCE by ROY. TEODORO accepted approximately $6,500 in cash in exchange for patient referrals from Washington Hospital.

### C. STATUTES VIOLATED

13. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. ROY IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

14. In January 2017, CW-1 identified Glennda SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

15. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

16. During the course of the UCO, SANTOS introduced UCE to multiple individuals willing to accept kickback payments in exchange for home health or hospice patients.

### B. ROY IS INTRODUCED TO UCE BY A CO-CONSPIRATOR AND ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE BENEFICIARIES

17. On or about August 20, 2017, SANTOS sent a group text message to CW-1 and UCE. During the exchange, SANTOS advised a case manager at Washington Hospital, later identified as ROY, was sending a patient referral to HHA Alpha (referred to as "Patient 1"[6] in the text exchange below). Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SANTOS: | [Patient 1]<br>Will be faxed by Belinda at Washington | SANTOS provides the name of the patient being referred and identifies the case manager as ROY. |
| SANTOS: | Pls have someone respond right away | |
| CW-1: | Ok | |
| SANTOS: | Thanks | |
| CW-1: | HH or Hospice | CW-1 asks whether the patient needs home health care or hospice care. |
| SANTOS: | Home health | |
| SANTOS: | Medicare | |
| CW-1: | [Okay emoji] | |
| CW-1: | Will call and accept once recieved | |

18. On or about August 21, 2017, UCE sent a text message to SANTOS asking to meet ROY in order to pay ROY for the referral of Patient 1. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Lovely Ms. Glenda! Thank you. If Belinda is available tomorrow, can we show our appreciation directly to her? Of course,. we will need to see you too for similar reasons. | UCE wants to pay ROY (i.e. "show our appreciation") a kickback for the recent patient referral. UCE also needs to pay SANTOS for her role in connecting co-conspirators in the kickback scheme (i.e. "similar reasons"). |
| SANTOS: | Yes I will arrange something<br>Let me ask her | |
| SANTOS: | After work always work for her | SANTOS will arrange an in-person meeting with UCE and is aware of her co-conspirator's availability. |
| UCE: | Works. Thanks! | |

6 Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc

19. SANTOS introduced CW-1 and UCE to ROY on August 31, 2017, during a dinner meeting. During the dinner, CW-1 and UCE discussed the kickback scheme with ROY. UCE stressed the need to be cautious about their arrangement and paid ROY $1,000 in cash for the referral of two patients ROY sent to HHA Alpha prior to their meeting (including Patient 1). Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So the goal is that we are kind of looking to kind of aggressively increase the census, and and we you know we are trusting her to build those confidential relationships that can make that happen and umm our sort of our our goal is that umm ya know there's other people in this business who is what we think, are a little too brazen. | UCE explains to ROY that SANTOS is connecting them with potential participants in the kickback scheme (i.e. UCE is "trusting her [SANTOS] to build those confidential relationships").<br><br>UCE further explains they want to be cautious to avoid detection of law enforcement, unlike others (i.e. "other people in this business. .. are a little too brazen"). |
| ROY: | Oh most definitely, most definitely. | |
| UCE: | And I think, they're going to find themselves, that their brazenness it's going to cost them. | UCE implies that other less careful (i.e. "brazen") people will be caught by authorities for participating in kickback schemes (i.e. "it's going to cost them"). |
| ROY: | Most definitely. | |
| UCE: | And, and what we want to do is slowly build up relationships. | UCE explains his/her desire to avoid the scrutiny of authorities by slowly increasing the number of patient referrals made in the HHA Alpha kickback scheme (i.e. "slowly build"). |
| ROY: | You must have been reading my mind. | ROY agrees with UCE's more cautious approach to the kickback scheme, which is designed to avoid detection. |
| UCE: | Ok, ok sounds good. Umm so, uhh we have something for you cause you've done, [ui] as I understand it a couple things for us alright | UCE acknowledges the two patient referrals already provided by ROY and the need to pay her a kickback in exchange. |
| ROY: | Yeah. | |
| UCE: | It's umm, I have an envelope with a thousand. | UCE provides ROY with an envelope containing $1,000 in cash. |
| ROY: | Mmm hmmm. | |
| UCE: | Is that ok? | |
| ROY: | Yes, that's [unintelligible]. | ROY accepts the kickback payment and affirms the amount is acceptable. |
| UCE: | Much appreciated. | |

20. During the course of the UCO, UCE recorded multiple in-person meetings with ROY. The meetings typically took place in close proximity to Washington Hospital while ROY was on shift working. ROY met with UCE on at least five occasions and received a total of $8,500 in kickback payments from UCE. In exchange for the kickback payments, ROY referred at least 14 patients to HHA Alpha, including ten Medicare beneficiaries.

### C. ROY INTRODUCES UCE TO A CO-CONSPIRATOR WHO ACCEPTS KICKBACKS IN EXCHANGE FOR THE REFERRAL OF MEDICARE BENEFICIARIES

21. On or about September 15, 2017, ROY sent a text message to CW-1, stating "Hello have something for you sent bee [by] Stella [TEODORO]". Following the text, HHA Alpha received patient referral paperwork which identified TEODORO as the case manager making the referral.

22. On or about September 21, 2017, UCE recorded a meeting with ROY in the parking lot of Washington Hospital in Fremont, CA. TEODORO accompanied ROY to the meeting in order to receive a kickback payment for the patients she referred to HHA Alpha. During their meeting, UCE discussed with ROY and TEODORO the kickback scheme and the risk associated with their arrangement. At the conclusion of the meeting, UCE paid ROY $500 cash and TEODORO $1,000 cash for patients ROY and TEODORO had referred to HHA Alpha prior to the meeting. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | [....] Obviously we're taking a little bit of a risk you know people can get into trouble for this. If any point you feel, you know uncomfortable with it there is something you think looks bad, just ... | UCE refers to the illegal nature of their kickback scheme (i.e. "get into trouble"). UCE asks TEODORO and ROY to help him minimize suspicion (i.e; "something you think looks bad"). |
| TEODORO: | Uh-huh. | |
| UCE: | Talk to us. | |
| TEODORO: | Ok. | |
| UCE: | And uh, and if there is something that you think doesn't look right, cause we all want you know the less red flags. | UCE reiterates the need to hide their kickback scheme (i.e. "less red flags"). |
| TEODORO: | Yeah. | |
| ROY: | Most definitely. | |

| | | |
|---|---|---|
| TEODORO: | Of course. | |
| ROY: | Yes. | |
| .... | | |
| UCE: | Um, yeah so five hundred per patient? And I believe it is one each. | UCE confirms terms of the kickback scheme as $500 per patient referral. UCE notes that he/she owes TEODORO and ROY for one patient referral each. |
| TEODORO: | Oh, I gave two. | TEODORO corrects UCE and says she is owed for two patient referrals. |
| ROY: | She gave two. | ROY confirms TEODORO is owed for one more. |
| UCE: | Oh, she gave two. I apologize. | UCE accepts TEODORO and ROY's representations that he/she owes TEODORO for two patient referrals (i.e. $1,000). |
| ROY: | Ok, yeah the last one was, um, I text to him [. ...] | ROY explains the second patient referral was sent via text message to the CW-1. |

23. During the course of the UCO, UCE recorded multiple in-person meetings with TEODORO. TEODORO met with UCE on at least five occasions and received a total of approximately $6,000 in kickback payments. In exchange for the kickback payments, TEODORO referred at least ten patients to HHA Alpha, including eight Medicare beneficiaries.

## III. PROBABLE CAUSE FOR THE VIOLATION

### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

**24.** Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

25. Based on all of the foregoing, probable cause exists to believe that ROY and TEODORO accepted kickback payments from UCE that were intended to induce ROY and TEODORO to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

26. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by ROY and TEODORO for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

27. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by ROY and TEODORO in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

28. Based on the foregoing, there is probable cause to believe ROY and TEODORO conspired to receive kickback payments in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), the anti-kickback act.

## V. REQUEST FOR SEALING

29. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

this 3rd day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge